Our second case this morning is the Estate of Swannie Her v. Craig Hoeppner. Mr. Barnes. Yes, ma'am. Yes, Your Honor. Good morning, Your Honors. May it please the Court, I am Robert Barnes representing the Estate of Swannie Her. We are 12 days away from the two-year anniversary of the death of young Swannie Her. And there may be a parent 12 days from now in West Bend, a working-class community west of Milwaukee, who will take their young child to what is advertised to this very day, like it was then, at Regner Park in West Bend as a summer swimming pond that is, quote, good for kids, that is such a, quote, mecca for recreation, that, quote, the pond is always, quote, bustling with activity. This pond was literally a state-created danger. The state-created danger started with creating a summer swimming pond that was itself dangerous because of the muddiness of the water that was so murky you could not see a feet beneath your own, beneath the top of the water. But that wasn't the only risk. The second level of risk, the state-created danger, was that there were hidden drop-offs, that if you were walking out, you could suddenly slip and you'd go five, ten feet down, and a young child in particular could drown quickly. These changes, the muddy water conditions were never improved upon. In fact, the state made no effort to do so. The drop-offs were not roped off at any time, even though the state could have done so. The state went even further. The state recommended the pond as an area for a child's play. They put in lifeguards who promised protection with a long list of policies and procedures intended to prevent one particular harm above all, the drowning of small children. The state knew, because of the unique dangers of the pond, that small children were at risk of imminent death. The defense's own expert in this case said the conditions of the pond created an unusually dangerous hazard. Here, the conditions for the lifeguard was to constantly screen the area, make sure no small child entered without a swim test, make sure any small child that was in the water had a swim test wristband, make sure that any small child in the water was not anywhere near the area where there was a significant drop-off, and make sure that they were within close proximity to an adult. In this case, they followed none of those instructions or policies or procedures. In the end, what happened was Swanee Hur was discovered by another adult stepping on her dead body 10 feet under the water. But that wasn't all that shocked the conscience of this case. Here, the director of parks, Mr. Hupner, when deposed, admitted he had conducted no further investigation after her death, that they were aware that on the same day, earlier in the same day of June 11, 2016, another child had briefly gone under in the same area, and yet no protective remedial actions taken. In fact, the state didn't even put up a sign warning parents of this risk. And it's notable that this was not only a state-created park, it was one where the parents paid money to go to each day. You had to pay money to get access to the area. In fact, the director of parks not only had not investigated, he'd made no inquiry to lifeguards at all. It was so bad, he didn't even know Swanee's age. He didn't even know how tall she was. He had no idea. Was she small? Was she tall? Those are after-the-fact occurrences. So what we need are facts, actual evidence to support a claim that the state increased, did something to increase the risk beyond what the normal risks of a man-made swimming hole are. Otherwise, your claim would call into question every municipal man-made swimming hole, which is not actionable. You've got to have evidence that there was something specific that West Bend did, and its director of parks and recreation, and its lifeguards, to actually create a hazard beyond what is ordinarily in place. With a man-made swimming hole, that is not a swimming pool. It's not going to have clear blue water down to the bottom of the pool. That's the nature of a man-made swimming hole, is that it's like a lake. You can't see to the bottom. So the murkiness of it is beside the point. That's the very nature of a man-made swimming hole, unless you mean by this claim to say that all man-made swimming holes are a state-created danger and provide an actionable basis for a federal claim when there's an injury or death. I mean, that is more or less what your claim is, because I don't know that you've produced any evidence that there was something especially risky that West Bend did with respect to this man-made swimming hole. Yes, Your Honor. I would see it as two different components. I believe that creating a muddy swimming pond and then advertising it as good for kids... Every day of the summer in municipalities all over Wisconsin and the rest of the country, I presume. Yes, Your Honor. But I believe that does fit a state-created danger doctrine. Now, that doesn't give action to a legal claim. Not by itself, it doesn't. You have to demonstrate that the state actors did something, took affirmative steps to increase the hazard. I would disagree with that, Your Honor. That's what the law requires. Actually, I would... They did something above and beyond opening a state or a municipal swimming hole for public use. I would respectfully disagree. Here's my argument, that there's two different components. One way you can have a substantive due process claim is you can create a state danger, and then that doesn't give you the claim. You have to further prove that no reasonable preventative steps to minimize the risk of that danger were taken. But I believe... That's not actionable as a substantive due process claim. It might be actionable as a negligence claim, but frankly, I don't even see a factual basis for much of a negligence claim here. All you've described is a failure-to-protect claim. I disagree, Your Honor. That's not actionable as a substantive due process claim. I disagree. For example, in Payne, this Court noted there were two separate bases. It did not say the only way you could bring a substantive due process claim was to increase risk of harm. That has never been the sole basis. Going back to the Scheney, the Supreme Court identified two different ways. Either the state created a danger, and then you have the additional evidentiary proof of no reasonable preventative steps, or they increased the risk of a known danger. So I don't think it's the case that you have to prove they increased the risk of a known danger as the only means of a substantive due process claim. For example, even in Gardner, 986 F. 2nd. 1122 and 1127, the Court noted that a state creates a danger, a dangerous situation, or makes someone more vulnerable to a known danger. It didn't require both. It didn't require only making one more vulnerable to a known danger. But let's put that aside. This is not a case of a state-created pawn. If this case is upheld, no kid is safe in any municipal park in America. If this case doesn't shock the conscience, then there's no conscience of the state left to shock. To give an example, here you had someone, they didn't just create a pool. They created a pond, they filled it with water, they took no steps to make sure, and this wasn't just muddy like a lake. This was so muddy you couldn't see a feet deep. Their own expert called it uniquely dangerous. But they went beyond that. They knew of a drop-off problem, that earlier that same day, a kid had fallen off and almost drowned. So they were put on notice of a specific risk that was unique. They knew of that risk. They knew of that risk particularly to small children. That's why they had particular policies and procedures in place that said they had to follow all of these to make sure that this known danger to the child, a small child, didn't occur. And here they followed none of those policies. They didn't follow any of those procedures. If this is okay, no kid is safe in any park in the country. It's one thing to say we don't want to impose on the state a duty to protect at every swimming pool. That's different than we're going to have a bunch of policies and procedures for a summer swimming pond that has risks that most pools do not, and that most other places do not, that they knew about particularly. It wasn't just muddy water. If it was just muddy water, that'd be different. It's muddy water with a drop-off in a particular location. They don't rope it off. They don't warn anybody. So those are two problems that are unique. But they go further. They have specific policies and procedures. Don't let the kid in the water without a swim test. If you see them without a wristband of a swim test, pull them out of the water. Don't let them be in the water unless they're near an adult. They didn't follow any of their policies or procedures. What is the evidence of that? The evidence of that is from the record. They admitted that in their depositions. And there's – put it this way, there's a re- What is the evidence connecting that – and I didn't see a failure to follow any policy or procedure with respect to what happened to Swanee. Nobody knows where she was swimming, where she went under, what happened to her precisely. That's an evidentiary gap here. There's no connection of her death to anything any of these individual lifeguards did or didn't do. Or anything that the park director did or didn't do. I believe that's a jury question, Jan. There's a reasonable – Well, no, you need evidence first before you can get to a jury. Especially – I mean, this is not a state law negligence claim. This is a due process claim. That's correct. But she had no wristband. There's no evidence to support that they did any of that. So there's no wristband. She was found near the drop-off area. All of that is a reasonable inference. And there's no evidence she was near an adult. All of that is reasonable inference that they did not do it. And they did not say – they admitted they didn't see her at all. So how could they have been following their procedure to pull her out, to make sure she does a swim test, if she has no wristband, and they don't remember seeing her, and she was dead for 10 minutes under the water? That sounds like a res ipsa loquitur kind of argument to me. And I don't think this case has been litigated on that basis. Nor would it be validly litigated on that basis as a due process claim. You're saying because she died, that means somebody did something wrong. No, here there's a lot of evidence that something did go wrong. And if this is the case, no kid is safe in any park in the country. That's the new law of due process, apparently, in the Seventh Circuit. That's where we're at. I reserve the vote for my time now. Actually, you're out of time, counsel. Oh, I am? I'm sorry. Thank you. Mr. Reginato. Your Honors, may it please the Court, my name is Mateo Reginato, and I represent the appellees in this case. The 14th Amendment Substance of Due Process Clause creates the constitutional right to be left alone. It does not create a constitutional right to receive police protection or rescue services. Although a narrow exception has been recognized in egregious cases where the government itself propels an individual into danger, restricts all avenues of self-help, and acts in a manner that shocks the conscious, this case, Your Honors, although tragic, does not fall within the limited state-created danger exception. The District Court's decision should therefore be affirmed. The Seventh Circuit addressed a state-created danger exception in Slade v. Board of School Directors of the City of Milwaukee, a drowning case where the Court held that the exception could not apply because the defendants in that case didn't propel the 12-year-old boy into the water or force the boy to enter the water, were not aware, the defendants were not aware that the boy was unable to swim, and the defendants didn't control where the boy went or ventured while he was in the water. The same holds true here, Your Honors. The appellees here didn't propel or require Swanny to enter the pond. Swanny decided to go into the pond with her family members, and Connie gave Swanny permission to go into the pond with her family members supervising her. Swanny could have remained outside of the pond without any adverse consequences, and Connie could have denied her permission to enter the water without any adverse consequences. Like in Slade, the appellees in this case also didn't control where Swanny ventured to while she was in the water. Swanny was in the custody of her family, went into the pond with her family, and was being monitored with her family while she was playing in Zone 3. Swanny could have remained in Zone 3 with her family members who were monitoring her without any adverse consequences. Swanny's family members who were monitoring her could have also denied her permission to leave Zone 3 without any adverse consequences. Like in Slade, Your Honors, the appellees in this case also didn't know about Swanny's swimming abilities. The family knew Swanny's swimming skills on June 11, 2016, and they decided on how to supervise her and on what areas she could go in the pond. No one that day, including Connie or any of the other family members, ever told the lifeguard that Swanny couldn't swim, that Swanny had any problems swimming, or that she needed any extra attention while in the water. In fact, during her deposition, Connie testified that she thought that Swanny was a good swimmer on June 11, 2016. The Seventh Circuit also addressed the state-created danger exception in a drowning case in Ross v. U.S. and allowed the exception to proceed in that case because of the egregious circumstances that were present. There, qualified scuba divers, firefighters, and a police officer were already at the scene and already knew that the boy was underwater and actively drowning. They were prepared to go in and dive and rescue the boy. Deputies arrived shortly thereafter and actively prevented that rescue attempt by telling everyone to stay out of the water, by threatening to arrest anyone who went into the water to attempt the rescue, and by actively maneuvering their boats in a position to prevent the rescue. The Court found in that case that the deputies were aware that the boy faced a significant or substantial risk of drowning at that time because they knew that the boy was underwater and drowning, they knew that he had been underwater for several minutes and that it could take only five minutes to drown, and they knew that their own rescue personnel was over 20 minutes away. The Court also found that the deputies affirmatively increased the inherent risk of danger that's by actively cutting off the aid that was available to the boy, and they disregarded that increased danger by failing to provide any meaningful alternatives because their own rescue personnel were 25 minutes away from the scene. Those circumstances are not present in this case, Your Honor, nor are there any other conscious, shocking, or egregious circumstances present here. Unlike in Ross, the appellees here didn't know that Swanee faced any additional risk of drowning that's not present in any other body of water on The lifeguards didn't observe any signs of struggling or distress from Swanee. In fact, no one, including Swanee's family members who were supervising her while she was in the water, or any of the other 200 patrons who were in and around the pond that day observed, or that time, observed any signs of struggling or distressed. Nor did anybody report any signs of struggling or distress to the lifeguards or ask the lifeguards for assistance at any point in time before the body was found. Unlike in Ross, the appellees in this case also didn't cut off any private forms of aid or do anything to increase the inherent danger that's always present in any lake and body of water in Wisconsin. They didn't prevent or hinder Swanee's family from denying her permission to go into the water, from restricting where she could go based on their knowledge of Swanee's swimming abilities, or from monitoring Swanee more closely while she was in the water. Swanee was in the custody and control of her family who allowed her to enter the pond, who were monitoring her while she was in the water, and who gave her permission to leave Zone 3. Nor did the appellees prevent anyone from rescuing Swanee as they did in Ross. Nor was there any reason to believe that the pond's topography or that the water visibility created an increased risk of drowning that's not present in every pond and watering hole in Wisconsin. In fact, this pond in particular has been operating for over 80 years with similar topography and with similar water visibility. There have been no other drownings in over 80 years during the entire operation. This is the only case where someone has drowned in that municipal pond. Unlike Ross, appellees also didn't disregard any known risk of drowning. With respect to Swanee in particular, the lifeguards in this case didn't deny any requests for assistance. No one told the lifeguards that Swanee had any issues swimming, and no one reported any signs of struggling or distress while Swanee was in the water. The lifeguards also reacted immediately after an emergency was known and discovered. They sounded an alarm, they cleared the pond of all the swimmers, they initiated CPR, and they called 911. In a general sense, the City also had numerous measures in place to reduce the inherent risk of drowning that's common and present in all bodies of water. They employed numerous lifeguards and required each and every lifeguard to be certified and trained by the YMCA or by the Red Cross before they even started. They provided then independent training before the swim season started to each and every lifeguard, and then provided ongoing weekly training to each lifeguard during the season. They also had policies and guidelines in place, and the pond was and there were rules to prevent non-swimmers from entering deeper areas. Nor did the lifeguards in this case act in a conscious, shocking manner or disregard policies. The lifeguards all testified in this case that they were in their respective position and that they were monitoring the water while Swanee was in the pond. There is absolutely no evidence or any testimony that the lifeguards were disregarding policies or were not doing their or from any of the other 200 patrons who were at the pond that day and who were observing the lifeguards and seeing what they were doing. There is no evidence. Nor is there any evidence of a hidden drop-off. The appellants in this case rely primarily on some hidden drop-off that is not supported by the record. In fact, I deposed the individual, the adult who was monitoring the child who went under allegedly, and she testified, and this individual was Swanee's aunt. Swanee's aunt testified that... Counsel, if I could interrupt for just a moment. It appears that we've lost Judge Kaney's phone connection, so we're going to have to reconnect him. So if you could just hold that thought. We'll stop your time. Chamber. Hello, Judge Kaney's Chamber. This is Judge Sykes. Could you connect us to Judge Kaney? Thank you. Hello? Judge Kaney, it's Judge Sykes. We lost you. Yes, you did. I'm sorry. We'll back up. Let me back up your time, Counsel, and give you an extra minute so that you can retrace your thoughts from the last minute or so. Thank you, Your Honor. Okay. With respect to the hidden drop-offs, Your Honor, there's no evidence of any hidden drop-offs in this case. I personally deposed Cha Fang, who was Swanee's aunt who was in that area and whose child went beneath the surface of the water that day as well. She testified that there are no hidden drop-offs in the area, and I quote during her deposition, she testified that the area doesn't drop off. It like gradually goes down, just like every other body of water in the state of Wisconsin, every pond and every lake. That's a little overbroad. A little overbroad. It's common knowledge that lakes and ponds are subject to drop-offs. There's just no evidence in this case that there was one in this pond. Correct, Your Honor. The only evidence in this case, Your Honor, is that the lifeguard simply didn't see Swanee go under, and we don't know why. We do know, though, that neither Connie nor Swanee's other family members who were in the water, who were monitoring Swanee, and who were dictating where Swanee could go, none of those people saw Swanee go under. Nor did any of the other 200 people who were in and around the pond that day. The appellants in this case are asking this court to expand the limited state-created danger exception to allow for liability in these types of cases where a municipality operates a pond with uneven topography and with limited visibility, and where a lifeguard simply didn't see one patron go under. Your Honors, as you recognize, numerous ponds in the state of Wisconsin have uneven topography and limited visibility. Allowing liability under these circumstances where no egregious conduct existed and where lifeguards simply failed to see a patron go under would give rise to a constitutional claim every time someone drowns in a municipal water hole. It would also undermine state legislative functions, including the legislator's decision to offer recreational immunity for these types of accidents in order to encourage municipalities and landowners to open up their property and land for recreational purposes. Your Honor, for these reasons, the court should decline to expand the limited state-created danger exception and affirm dismissal of all 14th Amendment substantive due process claims. Thank you. All right, thank you. Mr. Barnes, your time has expired. I'll give you an extra minute if you have anything to say in rebuttal. I believe in some of the issues concerned, factual issues that were in dispute or in controversy, sufficient for a jury to determine. Putting that aside, the question is are there any limits? In other words, it's one thing to say we don't want to impose on municipalities a duty that if they create a potentially dangerous amusement, we don't want to impose upon them a duty to prevent or take reasonable steps to prevent danger or harm that may be inherent to that. It's another thing to say that whenever they create a municipal event, aquatic event, they're never going to be responsible unless they fail to rescue. And that is essentially what the defense calls for. The effect of the scope of what the defense is talking about in asking for this Court's opinion would effectively take the recreational immunity statute and mean that there's no constitutional protection no matter what happens in this environment. Clearly, if the Court determines that certain facts weren't determined, that would be one thing, but it's another thing to adopt the entire defendant's version which would make all municipal parks unsafe for children in America. Thank you, Your Honor. All right, thank you. Our thanks to both counsel. The case is taken under advisement.